Cutts & Johnson *et al.*, plaintiffs in error, *vs.* N. A. Hardee, survivor, defendant in error.

Brown, C. J.

1. While the courts have the power, and it is their duty, when a proper case is made, to declare Acts of the Legislature unconstitutional and void, such Acts are always presumed to be constitutional, and the authority of the courts to declare them void should be exercised with great caution, and should never be resorted to but in clear and urgent cases.

2. That provision of the Constitution of the United States which denies to a State the right to pass any law impairing the obligation of contracts, does not interfere with the right of a State to pass laws acting upon the remedy.

3. There is a plain distinction between the *obligation* of a contract and the *remedy* for its enforcement, and while the Legislature may not impair the obligation of the contract, it has the undoubted right to change, modify or vary the nature and extent of the remedy, (provided a *substantive* remedy is always left to the creditor, so long as the State does not deny to her courts jurisdiction of contracts,) and to prescribe such rules of procedure and of evidence as may, in its wisdom, seem best suited to advance the administration of justice in the courts.

4. That part of the Act of the Legislature passed at its late session, entitled "An Act for the relief of debtors, and to authorize the adjustment of debts upon principles of equity," which provides for a change of the rules of evidence, (under which this case originated,) is not unconstitutional, though it may permit evidence to go to the jury which has not heretofore been allowed, and which the courts may consider irrelevant and improper. It is the province of the Legislature to prescribe the rules of evidence and of the courts to administer them.

5. It is no objection to the constitutionality of this Act that it authorizes the jury to reduce the amount of the debt sued for, according to the equities of the case, as this is done every day in court, in case of partial failure of consideration, and the like. This must be done, however, according to the real equities between the parties, and not according to the caprice of the jury, and when so done, it neither impairs the obligation of the contract nor works injustice to the parties litigant.

Cutts & Johnson *et al.*, *vs.* Hardee.

6. If this should be seized upon by the jury, and used as a pretext for reducing the debt, otherwise than the equities between the parties permit, it will be the duty of the Court to set aside the verdict when that fact is made plainly to appear.

7. In this case, the obligation of the contract was not 'in any degree impaired by the filing of the pleas by the defendant, to' which objection was made, as a foundation for the introduction of evidence under the statute, and the evidence should have been received, and if the jury had made an improper use of it, or found contrary to law and evidence, it would then have been time enough for the Court to interfere and set aside the verdict.

8. When the statute authorizes certain facts to be given in evidence, a demurrer to a plea which lays the foundation for such evidence, should not be sustained. The old rules of pleading in such case must yield to the statute.

McCay, J., concurring.

1. It is not to be presumed that the Legislature intends to violate the Constitution of the United States, and when words are used in an Act, they ought to be construed, if possible, so as to make the Act consistent with that Constitution.

2. The consideration of a contract, and whether there has been a tender of the whole' or any part of a debt sued on, and if the debt was not paid, that it was the creditor's fault, are not only in all cases fit matters for proof, but are often of great importance in arriving at proper conclusions as to the true rights of the parties in the matters before the Court. Nor can such evidence, in any proper use of it, at all tend to impair the obligation of the contract sued on.

3. If the property, upon which the credit was given in the contract, has been lost, or rendered worthless, it is competent for the Legislature to permit the defendant, when the contract is sued upon, to show by whose fault that property was lost or destroyed, and the value of it at the time of the contract, and at the time of the loss.

4. That clause of the Act of the Legislature under discussion, which authorizes the jury, in suits upon certain contracts, to reduce the *debt* sued upon, according to the equities of each case, was not intended to permit them to impair the obligation of the contract of the parties. The equity and justice there meant, is that fair and honest duty which each owes to the other under the contract, to be gathered from the whole transactionas, it actually occurred between them, and from the acts creating legal or equitable obligations, which have happened between them since the date of the contract.

5. The obligation of a contract cannot be impaired by the Legislature of a State, under the guise of changing the rules of evidence, or altering the mode of procedure. Nor can the Legislature authorize a court or a jury so to adjudicate between the parties to a contract, as to alter or impair its obligation, as it was, in fact, entered into.

6. Consistently with these principles, a State Legislature may alter the

Cutts & Johnson *et al.*, *vs.* Hardee.

rules of evidence, and change the mode of proceeding in the State Courts. Nor is it the province of this Court to declare an Act of the Legislature void, because it permits the introduction of evidence, which, in the opinion of the Court, may be irrelevant to the issue, and calculated to distract or mislead the minds of the jury.

7. The Act of the Legislature in 1868, so far as it allows the defendant, in all suits upon the contracts dated before the first of June, 1865, to give in evidence the consideration of the debt sued on, whether any tender has been made, and if the debt was not paid, whose fault it was, what property the credit was given upon, and if that property has been lost, by whose fault it was, and so far as it authorizes the jury in such cases, to reduce the debt sued on, according to the principles of equity, is not, if construed according to the well established rules for the construction of statutes, in violation of that clause of the Constitution of the United States which prohibits any State from passing a law impairing the obligation of contracts.

8. Should any Court of this State give to the Act in question, in any case tried before it, such a construction as would impair the obligation of the contract under investigation, this Court, in a proper case made, will correct the error.

9. A plea filed, setting up any facts which, by express enactment of the Legislature, are permitted to be given in evidence, is not demurrable.

WARNER, J., dissenting.

This was an action brought by the plaintiff against the defendants, on a promissory note, for the sum of $5,229 00, dated January 22, 1861, and due forty-five days after date.

The defendant, Stewart, filed a plea, setting up, by way of defence to the note, certain facts, as provided by the provisions of the first section of the Act of 1868, "for the relief of debtors, and to authorize the adjustment of debts upon principles of equity." The plaintiff demurred to the defendant's plea, and the Court below sustained the demurrer, and the defendant excepted.

The decision of this question necessarily involves the constitutionality of the Act of 1868. The first section of that Act provides, "that, in all suits which shall be brought for the recovery of debts, in any of the Courts of this State, or upon contracts for the payment of money, made prior to the 1st of June, 1865, (except for the hire or sale of slaves), it shall be lawful for the parties, in all such cases, to give in evidence before the jury impanneled to try the same, the consideration of the debt or contract which may be the subject of the suit, the amount and value of the property owned by the defendant at the time the debt was contracted, or the contract entered into, to show upon the faith of what property, credit was given to him, and what tender or tenders of payment he made to the creditor at any time, and that the non-payment of the debt or debts, was owing to the refusal of the creditor to receive the money tendered *or offered to be tendered*, the destruction or loss of the property upon the faith of which the credit

Cutts & Johnson *et al.*, *vs.* Hardee.

was given, and how and in what manner the property was destroyed or lost, and by whose default, and in all such cases the *juries*, which try the same, shall have *power to reduce the amount of the debt or debts sued for, according to the equities of each case, and render such verdicts as to them shall appear just and equitable.*" This Act of the Legislature, in my judgment, necessarily *impairs* the obligation of the contract, *as it existed under the law at the time the contract was made*, and it makes no difference whether that result is produced under the name of a remedy, or under the *pretext* of regulating *the admissibility of evidence*. Is the contract and the obligation to perform it as valuable *now*, under the provisions of the Act of 1868, as it was under the law applicable to the contract *at the time it was made?*

Relief-law. Demurrer. Decided by Judge J. M. CLARK. Sumter Superior Court. October Term, 1868.

Cutts & Johnson and James Stewart, on the 22d of January, 1861, gave their single bill or bond for $5,229 01, payable to the order of N. A. Hardee & Co., forty-five days after date, and also an agreement to pay expenses if suit had to be brought on it. Suit was brought thereon, in March, 1861. One of the plaintiffs died, and the case proceeded in the name of the survivor. The cause was pending in October, 1868, and then Stewart plead that "said note was made prior to the 1st day of June, 1865; that the consideration for the same, was a security of A. S. Cutts only; that, at the time said note was made, the amount and value of the property owned by the defendant, was about $200,000 00, and that on or about the — day of ———, 18—, said defendant tendered, or offered to tender, payment of said draft in currency, then in circulation generally, and which said plaintiff refused to receive in payment thereof; said property was lost or destroyed in the following manner, to-wit: one hundred negroes, worth $100,000 00, were manumitted, and the property therein destroyed; he owned about five thousand acres of land in Sumter and Schley counties, then of the value of about $45,000 00, and not worth more now than $7,000 00 or $8,000 00; he sold the most valuable place; he sold it for $5,000 00, in Confederate money, most of which money is now on hand, and worthless; he had no interest in the consideration of said note; said property was destroyed

by fire, etc.; and further, " that by the Constitution of the State of Georgia, this Court has no jurisdiction of this case."

The plea was demurred to, and the demurrer was sustained. This is assigned as error.

W. A. HAWKINS, LYON & DEGRAFFENRIED, VASON & DAVIS, for plaintiffs in error.

J. J. SCARBOROUGH, C. T. GOODE, for defendant in error.

BROWN, C. J.

The first section of the Act of the Legislature, passed at the session of 1868, entitled, "An Act for the relief of debtors, and to authorize the adjustment of debts upon principles of equity," is in these words:

" That in all suits which shall be brought for the recovery of debts, in any of the Courts of this State, or upon contracts for the payment of money, made prior to the first day of June, 1865, (except for the sale or hire of slaves,) it shall and may be lawful for the parties, in all such cases, to give in evidence before the jury impanneled to try the same, the consideration of the debt or contract which may be the subject of the suit, the amount and value of the property owned by the debtor at the time the debt was contracted, or the contract entered into, to show upon the faith of what property the credit was given to him, and what tender or tenders of payment he made to the creditor, at any time, and that the non-payment of the debt or debts was owing to the refusal of the creditor to receive the money tendered; or offered to be tendered ; the destruction or loss of the property upon the faith of which the credit was given ; and how and in what manner the property was destroyed or lost, and by whose default; and in all such cases, the juries which try the same, shall have power to reduce the amount of the debt or debts sued for, according to the equities of each case, and render such verdicts as to them shall appear just and equitable."

The pleas filed in this case were such as were necessary to

Cutts & Johnson *et al.,* *vs.* Hardee.

let in the evidence on the trial, which is authorized by the above section of the Act. Counsel for plaintiff demurred to the pleas, on the ground that the Act was unconstitutional and void. The Court sustained the demurrer, and ordered the pleas to be stricken from the record, and that decision is assigned as error.

1. It can not be questioned that the Courts have the power to declare Acts of the Legislature unconstitutional, null and void; and to refuse, on that ground, to enforce them. While this is a necessary power, it is one that should be exercised with great caution. Solemn Acts of the Legislature are always presumed to be constitutional and binding, and should never be set aside by the Courts, except in clear and urgent cases. If the Court entertains doubts, the decision should be in favor of the validity of the Act. 12 Wheat., 270. 16 *Ga. R.,* 102.

2. It is contended that this section of this Act violates that provision of the Constitution of the United States which denies to any State the power to pass any law impairing the obligation of contracts. But that provision of the Constitution does not prohibit the passage of laws, by the States, acting upon the remedy.

3. The distinction between the obligation of a contract and the remedy for its enforcement, is well established by the authorities; and while the Legislature has no right to impair the obligation of the contract, it has the undoubted right to change, modify, or vary the nature and extent of the remedy, provided a substantive remedy is left to the creditor. 12 Wheat., 285, 349–50; 4 Wheat., 200, 201; 1 Howard's Reps., 315, 316; Story on the Const., sec. 1385; 3 Peters' Reps., 280; 5 Pet., 456; 13 Pet., 312; 23 Maine Reps., 318, 322; 18 Maine, 109; 2 Fairf., 284; 6 Pick., 501; 1 Cowen, 501; 2 Ala., Reps., 404; 9 Ala., 713; 1 Texas, 598, 600; 4 Watts & Serg., 220; 5 How. Miss. Reports, 285; 1 Kernan's Reps., 286; 3 Denio, 274; 4 Gilmer, 221; 1 Morris, 70; 7 *Geo. R.,* 163; 9 *Geo. R.,* 258; 12 *Geo. R.,* 437; 13 *Geo. R.,* 306; 16 *Geo. R.,* 151; 28 *Geo. R.,* 345; 37 *Geo. R.,* 440, and

numerous other authorities which might be cited sustaining the same doctrine.

So long as the State undertakes to furnish remedies, she may vary or modify them at pleasure, if she does not destroy their substantive character. But it does not necessarily follow that a State is bound to furnish any remedy at all, for the enforcement of contracts. If, in the organization of her government, she should determine to establish the cash system in all trade and commerce, and should deny to her courts jurisdiction over any executory contract for the payment of money, I know of no coercive power under our system of government to compel her to change her system, and establish Courts with jurisdiction over such questions. Nor would the *obligation* of the contract be impaired by such a refusal on the part of a State to enforce the contract, as the injured party, in case the contract were not declared illegal by the laws of the State where made, would have his right of action wherever he might find the other party or his property, within the jurisdiction of a State whose laws afford remedies for the enforcement of such contracts.

The late Chief Justice Marshall, who was certainly one of the ablest jurists of any age, while he characterizes the conduct of a State, which would refuse to afford remedies to enforce contracts, in very strong terms of reproach, admits the power of the State to withhold all remedy, and denies that there is any coercive power over her, to compel her to enforce the performance of contracts. In Ogden vs. Saunders, 12 Wheat., 350-1-2, he says: " Our country exhibits the extraordinary spectacle of distinct, and, in many respects, independent governments, over the same territory and the same people. The local governments are restrained from impairing the obligation of contracts, but they furnish the remedy to enforce them, and administer that remedy in tribunals constituted by themselves. It has been shown that the *obligation is distinct* from the *remedy*, and it would seem to follow, that the law might act on the remedy without acting on the obligation. To afford a remedy is certainly the high duty of those who govern to those who are governed.

Cutts & Johnson *et al., vs.* Hardee.

A failure in the performance of this duty, subjects the government to the just reproach of the world. *But the Constition has not undertaken to enforce its performance.* That instrument treats the States with the respect which is due to intelligent beings, understanding their duties, and willing to perform them ; not as insane beings, who must be compelled to act for self-preservation. Its language. is the language of *restraint,* not *coercion.* It prohibits the States from passing any law impairing the obligation of contracts ; *it does not enjoin them to enforce contracts.* Should a State be sufficiently insane to shut up or abolish its Courts, and thereby *withhold all remedy,* would this annihilation of remedy annihilate the obligation, also, of contracts ? We know it would not. If the debtor should come within the jurisdiction of any Court of another State, the remedy would be immediately applied, and the inherent obligation of the contract enforced. This can not be ascribed to a renewal of the obligation ; for passing the line of a State can not re-create an obligation, which was extinguished. It must be the original obligation, derived from the agreement of the parties, and which exists UNIMPAIRED, though the remedy was withdrawn." "The Constitution contemplates *restraint* as to the *obligation* of contracts, not as to the application of *remedy."* So, if a State shall not merely modify or withhold a particular remedy, but shall apply it in such manner as to *extinguish the obligation* without performance, it would be an abuse of power which could scarcely be misunderstood, but which would not prove that *remedy* could not be regulated without regulating *obligations."*

"If it leaves the obligation untouched, but *withholds the remedy,* or affords one which is merely *nominal,* it is like all other cases of mis-government, and leaves the debtor still liable to his creditor, should he be found, or should his property be found, where the laws afford a remedy."

These quotations from this great luminary of legal science, who was never accused of too great partiality for the rights of the States, show clearly his opinion, not only that the *obligation* and the *remedy* are distinct, but that a State has

the power to regulate the remedy at pleasure, and that a denial of all remedy in *her* Courts does not "impair" the *obligation* of the contract.

I am now discussing the question of the power of the States to vary, modify, change, or withhold remedies; and not the justice or propriety of such action on their part. If the state of things had existed when Chief Justice Marshall delivered the above opinion, which now exists in Georgia; if two-thirds of the whole property of the State, including over $300,000,000 00, of one particular kind of property, had been destroyed by the fortunes of war and the action of government, and the State had, in such an emergency, before her people had time to recover from the shock, attempted, by the exercise of *all* her powers, to save something of the wreck, and to relieve them from the payment of debts contracted for property destroyed by the government, which must have been a total loss to the vendor, if he had retained it; or, in case of the destruction of the property on the faith of which debts were contracted, if she had attempted, by the fullest exerercise of her powers, to compel an equitable distribution of the losses among debtors and creditors, the learned Chief Justice might have taken a very different view of the *propriety* of her conduct, while acknowledging the amplitude of her *power* to modify, change, or withhold, remedies.

It is claimed, however, that the Supreme Court of the United States, in the case of McCracken vs. Hayward, 2 How., 608, has ruled that the law of the State, in existence at the time the contract is made, becomes part of the contract, and that the Legislature has no right to change that law, no matter whether it applies to the validity and construction of the contract or to the remedy, but, that the plaintiff is entitled to his remedy, under the law as it then existed. I am free to admit that there are expressions in the opinion delivered by Mr. Justice Baldwin, in that case, which seem to favor that construction. It is worthy of remark, that that case does not seem to have been very well considered by the Court, as there was no appearance by counsel on either side. A written argument was submitted for the plaintiff in error, in whose

Cutts & Johnson *et al.*, *vs.* Hardee.

favor the decision was made; but nothing, whatever, was submitted for the defendant. Justice Catron observes, " I have formed no opinion whether the Statute of Illinois is constitutional or otherwise. The question raised on it, is one of the most delicate and difficult of any ever presented to this Court; and as our decision affects the State Courts throughout, in their practice, I feel unwilling to form or express any opinion on so grave a question, unless it is presented in the most undoubted form, and argued at the bar."

It is further to be observed, that it was not necessary to go to this extent to decide the question made by the record, then before the Court.

The State of Illinois had not denied to her Courts jurisdiction of the class of cases then before the Court. But, while she undertook to furnish a remedy, she had enacted that property levied on to satisfy executions on debts contracted prior to the first of May, 1841, should be appraised by three house-holders, and have its value endorsed upon the execution, or upon a piece of paper thereunto attached, signed by them; and a sale was forbidden, till two-thirds of the appraised value should be bid for the property. It is very clear that this provision of the statute might defeat all remedy, while the State professed to furnish a remedy, as no sale could ever be made till two-thirds of the value placed upon the property by the appraisers, was bid, no matter how unreasonably, or how much above the true value, the appraisers might price the property. The *substantive* character of the remedy was destroyed by the statute, which proposed to give a remedy, and the decision of the Court, declaring this statute unconstitutional, was in harmony with the current of authorities on this subject. The constitutionality of this Act was the only question presented for the consideration of the Court. They declared it unconstitutional, and, to that extent, the decision is authority. But all that is said about the law of the remedy, entering into the contract, and forming part of it, is *obiter*. And with the most profound respect for that high tribunal, and for the opinions of the able Judges who then sat on the bench, I will add, it is against the current of

authority, and in conflict with the opinions of many of the ablest Judges, including Chief Justice Marshall, who have adorned the position held by Mr. Justice Baldwin and his associates.

In commenting on the decision in this case, in 1 Kernan's Reps., 386, Judge Denio, of New York, says: "In the able and discriminating opinion of Chief Justice Taney, in the first case, (Bronson vs. Kenzie,) the right to make such changes (in the remedy) is distinctly asserted; and, if the opinion in McCracken vs. Hayward held the contrary, it was unnecessary to go to that length, and the doctrine would be hostile to the principle of several prior cases, and an unwarrantable restriction upon the powers of the State governments."

The objection to the constitutionality of the Illinois Act rested upon the ground that the property might *never* bring two-thirds of the appraised value. This view is sustained by the decision in the case, The United States vs. Conway, Hemp., 313, in which it was ruled that a law which protects the debtor's property from sale on execution for *one year*, if two-thirds of the appraised value shall not be offered, does not impair the obligation of the contract.

The case of Van Hoffman vs. The City of Quincy, 4 Wallace, 535, when carefully examined, is found to contain no authority for the position I am controverting.

At the time the bonds in question were issued by the city, there were statutes of the State of Illinois authorizing the city to issue them, and authorizing and requiring the corporation to levy, from time to time, sufficient tax to pay the coupons and bonds as they become due. The Act of 1863 attempted to repeal the Acts authorizing and requiring the collection of sufficient tax to meet the payments as required by the terms of the contract. And the sole question presented for the consideration of the Supreme Court of the United States was, whether the Legislature of Illinois had power to repeal the statutes providing for taxation to pay the bonds, till they were satisfied? The Supreme Court held, that the issuing of the bonds under the statutes was a con-

Cutts & Johnson *et al.*, *vs.* Hardee.

tract, and that an Act of the Legislature repealing these statutes, before the bonds were paid, impaired the obligation.

It will be observed, in this case, that the statutes themselves formed part of the contract, as it was under their express authority that the city issued the bonds, and their repeal amounted to a repudiation of the bonds. Well might the learned Judge who delivered the opinion say, that the laws which subsisted at the time and place of making the contract, *and where it was to be performed*, entered into and formed part of it. As applicable to the case before the Court, no one can question the correctness of this position.

The very illustrations given by the learned Judge show that he does not intend to lay down the broad proposition contended for, in this Court, that the law of the remedy existing at the time enters into the contract, and becomes part of it. Mr. Justice Swayne says: "Illustrations of the proposition are found in the obligation of the debtor to pay interest after the maturity of the debt, when the contract is silent; in the liability of the drawer of a protested bill to pay exchange and damages, and in the right of the drawer and indorser to require proof of demand and notice." These illustrations show what is meant by the general language used, and are not inconsistent with the position that the Legislature may pass laws acting upon the *remedy*, while it may not impair the *obligation* of the contract.

Indeed, the learned Judge distinctly admits this power in the Legislature. He says: "This has reference to legislation which affects the contract directly, and not indirectly, or only by consequence." Again he says: "They (the States) may also exempt from sale, under execution, the necessary implements of agriculture, the tools of a mechanic, and articles of household furniture. It is said, regulations of this description have always been considered, in every civilized community, as properly belonging to the *remedy*, to be exercised by every sovereignty according to its own views of policy and humanity. It is competent for the States to change the form of the remedy, or to modify *it* otherwise, as they may see fit, provided no substantial right secured by the con-

tract is thereby impaired. No attempt has been made to fix definitely the line between alterations of the remedy, which are to be deemed legitimate, and those which, under the form of modifying the remedy, impair substantial rights. Every case must be determined upon its own circumstances."

Again, he adds : "If these doctrines were *res integræ*, the consistency and soundness of the reasoning which maintains a distinction between the contract and the remedy, or, to speak more accurately, between the remedy and the other parts of the contract, might, perhaps, well be doubted. But they rest in this Court, upon a foundation of authority too firm to be shaken ; and they are supported by such an array of judicial names that, it is hard for the mind not to feel constrained to believe they are correct."

Here, then, the difference between *obligation* and *remedy*, or between *contract* and *remedy*, is admitted in the fullest sense, as firmly established in the Supreme Court of the United States, too firmly established to be shaken ; and the right of a State to *change* the *form* of the remedy, and otherwise to *modify it*, is distinctly conceded in the very case relied on in this Court, by those who deny this power in the Legislature, and contend that the law of the remedy in existence at the time the contract was made, enters into, and becomes part of it. The Supreme Court does not hesitate to admit that there is no definitely fixed line between *alterations* of a remedy, which are to be deemed legitimate, and those which, under the form of modifying the remedy, impair substantial rights ; and that every case must be determined " upon its own circumstances." The admission, by that high tribunal, of the right of the Legislature to *alter* or *modify* the law of *remedy* at all, is a conclusive admission that the law of remedy in existence at the time, is no part of the contract, and does not enter into it. If it did, the least change or modification of the law of the remedy, would, to that extent, impair the obligation of the contract.

But will this doctrine, that the law of the remedy as it exists at the time the contract is made, enters into and becomes part of it, which the plaintiff is entitled to have administered

in enforcing the performance of the contract, bear the test of critical examination? Can it be sustained upon principle or authority? I think not. When an attempt is made to reduce it to practice, its advocates, appalled by the mischief that would result from its enforcement, are driven to engraft upon it, so many exceptions, resting upon principles so absolutely in conflict with the principles upon which the rule is claimed to rest, that its force is destroyed, and the unsoundness of the position is demonstrated.

Take the case of the statute of limitations of a State, which bars an action on a promissory note after six years, and tell me, if the rule under consideration be a sound one, how it is that the Legislature may shorten the period to four years, or extend it to eight years, and compel parties to contracts then in existence, to conform to it as changed? If the law of the remedy, as it exists when the contract is made, enters into, and becomes part of it, the payee of the note stipulates that he shall be allowed six years after the note is due to bring his suit, and the maker agrees to it, and no change of the law, reducing it to four years, can bind the payee or holder of the note. On the other hand, if the rule be a sound one, the maker of the note stipulates when he makes the contract, that the holder shall be barred if he does not sue in six years, and any law of the State, extending the period to eight years, impairs the obligation of the contract, and is null and void. I need not cite authorities to prove that the Legislature, in the case supposed, has the power to limit the period to four years, or extend it to eight. It is universally admitted, in all the Courts. And why? Because, say the Courts, the statute of limitations acts upon the remedy; and the Legislature has the undoubted right to vary, alter, or modify the remedy at pleasure. How can this universally acknowledged rule of decision be sustained, if the law of the remedy, as it exists at the time the contract is made, enters into, and becomes part of it?

I will cite a single case, decided by the Supreme Court of the United States, The Bank of Alabama vs. Dalton, 9 Howard, 522, to show the extent to which this doctrine has been

carried.    The State of Mississippi passed a statute of limitations, in 1844, which barred *all* suits on judgments recovered within that State, after a lapse of seven years; and all suits on judgments *thereafter* rendered out of the State after six years, and all suits upon judgments obtained out of the State *before* the passage of the Act, within two years *after* the passage of the Act.    Judgment was obtained by the plaintiff against the defendant, in Alabama, on the 7th of February, 1843.    The defendant, afterwards, removed to Mississippi, where he arrived on the 10th day of November, 1846, more than two years after the date of the limitation Act above mentioned.    Suit was commenced against him, on the judgment in the United States District Court, for the Northern District of Mississippi, on the day he arrived within that State.

The defendant pleaded the statute of limitations of Mississippi as his defence, to-wit: that the suit was not commenced within two years from the date of said Act.    It was admitted that this was the first day he had been in Mississippi, or could have been sued there.    The Supreme Court of the United States were unanimously of the opinion, and so ruled, that the statute of limitations of Mississippi governed the case; that it acted only upon the *remedy*, and violated no provision of the Constitution.    The Court says : " In administering justice to enforce contracts and judgments, the States of this Union act independently of each other ; and their Courts are governed by the laws and municipal regulations of the States where the remedy is sought, unless they are controlled by the Constitution of the United States, and the laws enacted under it.    This the Court held was not so in this case.    Here the plaintiff had lost his remedy, in Alabama, by the removal of the defendant from that State; and though he sued the first day the defendant resided in Mississippi, it was held that the laws of that State, which denied him any remedy, were not in violation of the Constitution. In other words, the Supreme Court of the United States has, in effect, held that the State might *destroy* the remedy within her jurisdiction, upon a judgment from another State, by

Cutts & Johnson *et al.*, *vs.* Hardee.

statute of limitations, without impairing the obligation of the contract.

Again, the law of the State, at the time the contract is made, authorizes imprisonment for debt. The debtor makes the contract with full knowledge that it is the right of the creditor, under the law governing the remedy then in existence, to arrest and imprison him in case of non-performance, till the debt is paid. The creditor knows this to be the law of the remedy, and contracts with reference to it. Indeed, he may rest on this as his only reliable and effective remedy. He may know the character of the debtor, that he is wanting in principle, and that all his property is in money, bonds, or other *choses* in action, which cannot be reached by the levying officer. But he knows it is his right, under the remedial laws of the State, to arrest him on a *ca. sa.*, and imprison him till he delivers up his hidden treasure, which is ample for the satisfaction of the debt. Relying on this remedy he gives credit, which he would not give if the remedy by imprisonment did not exist. Now, if the rule under consideration be correct, he contracts for the right to resort to this means, and use this remedy to collect his debt. He gives the credit upon this faith, and upon this alone. A change of the law which abolishes imprisonment for debt, and takes away this remedy, destroys the very remedy upon the faith of which the credit was given; it takes away all effective remedy, and renders the loss of the debt absolutely certain, which, without the change, he would have had no difficulty in collecting, the payment of which the debtor would not have attempted to evade, but for the change in the law of the remedy.

And, in this connection, let it be borne in mind that the English law as it existed, and was adopted in this country, gave this remedy; and we may reasonably conclude that the framers of the Constitution, who were familiar with the rule, and who were daily in the habit of seeing it carried out in practice, had as much reference to this as to any other remedy when they adopted the clause of the Constitution prohibiting the States from passing laws impairing the obligation of con-

tracts. Then, upon what reason can it be insisted that they intended to permit the States to alter, vary, or *abolish* this remedy, and to deny them the right to change or vary other remedies of much less value to the creditor?

If the Legislature can exempt the body entirely from seizure for the non-payment of a debt then in existence, why can it not exempt a horse, a cow, a tract of land, or any other piece of property? Can a solid legal reason be given to sustain the one, that will not apply with equal force to the other? If one impairs the obligation of the contract, the other does; both do, or neither does. If the Legislature may exempt the body, and leave the property subject, why may it not reverse the rule, and exempt the property and leave the body subject? Whatever may be said about the humanity of the age allowing the one and revolting at the other, the *legal* reason is the same in both cases, and the power of the State over the remedy is the same. I have seen no successful attempt by the advocates of the rule I am now combating to draw a solid distinction between the two cases, supported by logical or legal reasons. I expect to see none, for the simple reason that the legal distinction does not exist.

But what say the Courts on this question? The decisions are as unanimous as they are on the question of the statute of limitations. They hold that the law authorizing imprisonment for debt, is a law pertaining to the remedy, and that it is within the legitimate power of the State legislatures, to change this law of the remedy as to pre-existing, as well as to subsequent contracts, without impairing this obligation.

The case of Mason vs. Haile, decided by the Supreme Court of the United States, reported in 12 Wheat., 370, is a strong one. In that case Haile was in prison, having the benefit of prison bounds, under a final process against the body, and was discharged by a resolution of the Legislature of Rhode Island, without the payment of the debt; and the Supreme Court held, that this resolution did not impair the obligation of the contract. The Court says: "This is a measure which must be regulated by the views of policy and expediency entertained by the State legislatures. Such

Cutts & Johnson *et al.*, *vs.* Hardee.

laws act mainly upon the *remedy*, and that in part only. They do not take away the *entire remedy*, but only so far as *imprisonment forms a part of such remedy.*"

Mr. Justice Story, in his commentaries on the Constitution, section 1381, says: "Rights may indeed exist, without any present, adequate, correspondent remedies, between private persons. Thus, a State may refuse to allow imprisonment for debt, and the debtor may have no property. But still the right of the creditor remains, and he may enforce it against the future property of the debtor." Again, in section 1385, he says: "And a State Legislature may discharge a party from imprisonment upon a judgment in a civil case of contract, without infringing the Constitution, for this is but a modification of the remedy, and does not impair the obligation of the contract."

The same doctrine is held in the case of Sturges vs. Crowninshield, 4 Wheat., 200, where Chief Justice Marshall says: "The distinction between the obligation of a contract, and the remedy given by the Legislature to enforce that obligation, has been taken at the bar, and exists in the nature of things. Without impairing the obligation of the contract, the remedy may certainly be modified as the wisdom of the nation shall direct." In that case, the insolvent law of New York, which discharged the defendant from imprisonment without the payment of the debt, was sustained by the Court.

Another illustration of the unsoundness of the position, that the remedial laws of the State, in existence at the time the contract is made, enter into or become part of it, and in support of the position that the laws governing the remedy may be changed or modified by the Legislature, without impairing the obligation of the contract, is found in the decisions of the Supreme Courts of the several States, sustaining the constitutionality of the *stay-laws*, forbidding the execution of process for the enforcement of contracts then in existence, for such periods, in the future, as the statutes of their respective States had prescribed.

It is worthy of remark that the more recent decisions of

the courts of the Northern States, so far as they have come under my observation, sustain laws of this character, while the courts of several of the Southern States, where the condition of the country made the stay much more necessary to the welfare of the people than in the Northern States, where the losses by the war were less ruinous, have set aside stay-laws as unconstitutional. In Pennsylvania, the doctrine is well settled, that the Legislature may pass a stay-law, prohibiting the sale of property, or staying process for the enforcement of contracts in existence, for a definite and reasonable time; and it has been ruled, that a stay of three years is not an unreasonable period. This has been the rule of decisions in that great State for a quarter of a century past.

In Chadwick vs. Moone, 8 Watts & Sergt., 49, it was held, that local statutes which suspend, for a reasonable time, execution of a judgment on a previous contract, are not prohibited by the Constitution of the United States, and that the statute passed by the Legislature of that State in 1842, suspending, *for a year*, a sale under execution for less than two-thirds of the appraised value, is not unconstitutional. That able jurist, Chief Justice Gibson, delivering the opinion of the Court, said: "This case differs from the Illinois statute held by the Supreme Court of the United States to be unconstitutional, in 2 How., 608, in this cardinal feature, that its prohibition of execution was *perpetual*, while the duration of the stay, in Pennsylvania, was *limited*. In other words, the one might entirely destroy the remedy, while the other, as in the case at bar, only postponed the period of its performance."

The same doctrine has been affirmed in Brietenback vs. Bush, 8 Wright's Reps., 313; Cox vs. Martin, *Ibid*, 322; Drexel *et al.* vs. Miller, 13 Wright, 246; and Clark vs. Martin, 13 Wright, 299. The statute under which these decisions were made authorized a stay which might last for three years.

In Baumback vs. Bade, 9 Wisconsin Reps., 559, the Supreme Court of that State fully sustains the constitutionality

Cutts & Johnson *et al., vs.* Hardee. .

of a stay-law. The same doctrine is ably sustained by the Supreme Court of Iowa, in McCormick vs. Busch, see Law Reg. for December, 1863. In this case the learned Chief Justice, delivering the opinion, says: "We have found no case which holds that laws, giving the right to a *stay of execution* upon certain terms, would be invalid, as applied to prior contracts, unless it be certain cases in Kentucky, which seem to be based upon certain peculiar provisions in the statute."

I may remark, that the late rulings of the Courts of some of the Southern States had not then been made. These Southern decisions have not generally been unanimous, and with all due deference to the opinion of the majority of the Court, I must say, that the dissenting opinions have been sustained by the weight of authority and the better reason. See the able dissenting opinions of Judge Walker, of this State, Judge Aldrich, of South Carolina, and others.

But aside from the numerous decisions on this subject, and the contradictory positions which the advocates of the doctrine that the remedial laws of the State, in existence at the time, enter into, and become part of, the contract, are driven to assume, the doctrine has no foundation in principle, and rests upon no sufficient reason.

There have been various definitions of the *obligation* of a contract. Mr. Justice Baldwin, in the case of McCracken vs. Hayward, says: "the obligation of a contract consists in its binding force on the party who makes it." Mr. Justice Trimble, in Ogden vs. Sanders, says: "The obligation of the contract consists in the *power* and *efficacy* of the law, which applies to and enforces performance of the contract, or the payment of an equivalent for non-performance." Mr. Webster, in the argument of the same case, defines it to be "the *duty* of performing a legal agreement." Whatever may be the correct definition, (and upon this point scarcely any two Judges agree,) the position that the remedial laws of the State, in existence at the time, form part of it, is untenable.

The remedial laws of almost every State fix a time within

which debts may be collected by suit in the Courts.   If these laws enter into the contract, its obligation is impaired by any change made in the law of the remedy.   A enters into a contract with B, by which he binds himself to pay him one thousand dollars by the first day of January next.

The presumption of law is, that A will keep his promise, and if he does so, the remedial laws of the State have no connection whatever with the contract.   But suppose the contract is broken by non-performance, the obligation still exists, and A is still under "the *duty* of performing his legal agreement," and B is entitled to his remedy to enforce performance.   But what remedy?   The particular one afforded by the law of the State at the time the contract was made, or the one afforded to suitors at the time the aid of the courts is sought?   Unquestionably the latter.   If the former were his right, he would be entitled to it, no matter where the action might be brought.   If the contract were made in New York, and the suit was brought in Georgia, the plaintiff would, if that be the rule, be entitled to have the remedial laws of New York, which were in existence at the time the contract was made, enforced in the Courts of Georgia, which is contrary to the practice and decisions of all the Courts.

Or, suppose the suit is brought in the Courts of Georgia upon a contract made in Georgia five years since.   Then, the law allowed the parties a trial, first by a *petit* jury, and either party dissatified was entitled to an appeal to a special jury, on payment of cost and giving security, as a matter of right, entered within four days from the adjournment of the Court. The new Constitution abolishes the appeal, and allows but one jury trial, but gives the Courts the power to grant new trials in proper cases.   Are parties to contracts made prior to the new Constitution entitled to an appeal to a special jury in a suit brought since the change was made?

Again, the change made by the new Constitution greatly accelerates the collection of debts in this State.   Under the old law, the defendant might file his pleas (generally not under oath) at the first term, and the case stood for trial by a jury at the second term.   But at that time, either party

Cutts & Johnson et al., vs. Hardee.

had the right to a continuance of the case upon a proper showing. After each party had a continuance, the case must be tried by the petit jury, and either party dissatisfied might enter an appeal to a special jury. The case then stood for trial again at the next term. But each party was entitled to two continuances on the appeal, on proper showing, as matter of right, and to as many more for providential cause as the Court should think the principles of justice required. This might amount to a delay of several years before final judgment.

The new Constitution provides that the Court shall render judgment without the verdict of a jury, in all civil cases founded on contract when an issuable defence is not filed on oath. This not only cuts off the appeal from the petit to the special jury, with all its delay, but it abolishes jury trial, in all civil cases founded on contract unless the defendant files an issuable plea under oath. This change greatly abridges the right of defence allowed to a debtor by the old law, and accelerates the collection. But I apprehend it does not impair the obligation of contracts made prior to the adoption of the new Constitution. And yet, there is no escape from such a conclusion, if the law of the remedy in existence at the time the contract is made, enters into, and becomes part of it; and, in that case, any debtor would have a right to claim that his cause be tried under the old Constitution and laws, which are no longer in existence. This would be contrary to the practice of the Courts, and the almost unbroken current of decisions.

After a contract has been broken by the failure of the debtor to pay at the time agreed upon, the Constitution fixes no other time when payment shall be made, or when it may be coerced by law, but it leaves the creditor to collect when he can, under the remedial laws of the forum where he sues; which are no part of the contract, and are the subject of change by the Legislature, in accordance with its views of public policy. Take the case of a contract made by a citizen of Georgia with a citizen of New York, for an amount over $500 00. The New York creditor may sue in either the

Courts of this State, or of the United States.   In the one Court, prior to the adoption of our new Constitution, he could, in no case, get judgment before the second term.   In the other Court, if no issuable plea was filed, he could get judgment at the first term.   Here are two laws, each affording a remedy in the same State, for the collection of the same debt.   Now, if the law of the place in existence at the time the contract was made, enters into, and becomes a part of it, which of the two laws governing the remedy, is part of the contract in such a case?   It cannot be both.   The truth is, it is neither.   But each government has the right to fix the times within which it will allow collections to be made in its own Courts, in accordance with its own views of sound policy or humanity, and to vary, alter, or modify them at pleasure.

Again, suppose the late Convention had made provision in the Constitution of Georgia, that the Superior Courts should sit but once a year, instead of once in six months, as heretofore, and that no sheriff should be ruled for money, except in term-time.   This would have stopped the collection of judgments then in existence, for six months longer than the time allowed by law when they were rendered; and would have delayed the rendition of judgment, in case of contracts then in existence, for six months.   But would this have impaired the obligation of the contract? or could creditors have compelled the Courts to sit every six months, in cases of contracts made prior to the change?   Unquestionably not.   Why not?.   For the simple reason that the law of the remedy then in existence, is no part of the contract, and the creditor has no right to claim that it be enforced according to that law.

Under our old Constitution the Supreme Court was obliged to deliver its decisions in every case that came before it, at the first term, except for providential cause, and the creditor, if the judgment were in his favor, had the right to the benefit of the decision at the first term.   The new Constitution authorizes the Court, in its discretion, to withhold its decision till the second term.   This may delay the creditor six months

Cutts & Johnson et al., vs. Hardee.

in making collection, but it will not probably be contended that the Supreme Court violates the obligation of contracts made prior to the new Constitution, by holding up its decision till the second term.

I might multiply illustrations and authorities to prove that the law of the remedy, in existence at the time, is no part of the contract, but I deem it unnecessary. Those already produced are, to my mind, sufficient to show that the *dicta* of Mr. Justice Baldwin, in the case referred to, are not law, and are irreconcilable with the current of the decisions of the Supreme Court of the United States, and of the State Courts, and in conflict with the opinions of the ablest jurists this country has produced.

4. Whether the evidence which is allowed to go to the jury, under this statute, is such as the Courts may consider relevant and proper, is not the question. It is not the province of the Courts to prescribe the rules of evidence by which they will be governed in the investigation of causes. That power belongs to the legislative department of the Government. The Legislature may establish new rules of evidence in derogation of the common law, but the judicial power is limited to the rule laid down. Smith vs. The United States, 5 Pet. 292. 35 *Ga. R.*, 26.

5. It is no good objection to the constitutionality of this Act, that it authorizes the jury to adjust the equities between the parties, and to reduce the amount of the debt or debts sued for, according to the equities of each case. This is done every day in our Courts, in cases where the defendant sets up a partial failure of consideration, fraud, mistake, and the like. Indeed, it is one of the objects of trial by jury to hear all the facts pertinent to the issue, and find, not according to the face of each written contract, but to see that the real equities between the parties are adjusted, and justice done according to those equities. And if, by reason of the rigid rules of the common law, this cannot be done, the Court of Chancery is ever ready to aid the Courts of law in the accomplishment of this great aim of all enlightened jurisprudence. The new Constitution gives the General Assembly power to

merge the common law and equity jurisdiction of the Courts, with a view to the just arrangement and settlement of all the equities between the parties in the *forum* where the litigation may be commenced.   And the Legislature is not confined in its enactments to the old law of remedies, as it existed in any particular country or age.   The science of jurisprudence, as well as all others, is progressive, and the rules governing the Courts in the administration of the law of rights and remedies, are varied and changed, as the civilization and enlightenment of the age, and the changing necessities of society may require.   This is illustrated by the endless variety of rules and forms in the different States of the Union, all acting under the same Constitution of the United States, which, it is claimed, this change violates.   The rules of evidence by which the Courts and juries are governed, in deciding upon the equities between the parties litigant, are ever changing in each of this large family of States.   Probably no two are alike.   The Constitution of the United States does not require that they shall be.   In some of the States the parties in interest are excluded from giving evidence.   In others, Georgia among the number, no one is incompetent as a witness in a civil case, on account of his interest, except in certain cases mentioned in the statute.   The change was made in this State within the last few years.   It was as much at variance with the old rules of evidence known to the Courts and the profession as is the Act now under consideration.   But the Courts have upheld it, and the Supreme Court of the United States, in case of a sister State, has held that this State law, making this radical change in the rules of evidence, binds the Courts of the United States sitting as such States as have made the change.   1 Bl., 427; Ibid, 431.   And just here, let me inquire how this decision can be sustained, if the remedial laws of the State, which necessarily include the law of evidence, enter into and become part of the contract, and can not be changed without impairing its obligation?

But I do not consider this an open question in this Court, since the numerous decisions made by it sustaining the Ordinance of the Convention of 1865, by which it is ordained:

That *all* contracs made between the 1st of June, 1861, and the 1st of June, 1865, whether expressed in writing or implied, or existing in parol, and not yet executed, shall receive an *equitable construction,* and either party, in any suit for the enforcement of any such contract may, upon the trial, give in evidence the *consideration* and the *value thereof at any time,* and the intention of the parties as to the particular currency in which payment was to be made, and the *value* of such currency *at any time,* and the verdict and judgment rendered shall be on principles of *equity.*

I am aware that those who attempt to draw a distinction in principle between that ordinance and this statute, allege that it was passed to adjust the equities and do justice between parties to contracts made during the war, most of which were made with reference to Confederate treasury notes, and were intended to be paid in that currency; and further, that the true object of that ordinance was only to permit an inquiry in Court as to the meaning of the word " dollar" when used in such contracts. But an examination of the language of the ordinance at once shows that it has no such limited import. It is not confined to contracts made with reference to Confederate treasury notes, or intended to be paid in such notes. It expressly embraces *all contracts* made within the period mentioned, and lets in the evidence, on the trial, of each and every one of them, no matter what may have been the intention of the parties, the currency in view, or the consideration; and it authorizes the jury to adjust the equities between the parties, and in so doing, if the proper adjustment requires it, to *reduce the amount of the debt sued for.*

The pretext that the only intention of the ordinance, was to permit evidence as to the meaning of the word dollar, when used in any contract, made during the period covered by it, is equally unfounded. The ordinance authorized either party to give in evidence the *consideration* and the *value* thereof *at any time.* Suppose the consideration of the note in suit, dated in 1861, to be a tract of land. What does the value of the land in 1865 or 1869, have to do with the meaning of the parties, at the time they made the con-

tract, as to the sense in which they used the word dollar? What inference can be drawn by the jury on the trial, to aid them in the inquiry as to the sense in which the parties used the word "dollar" in 1861, by proof of the value of a tract of land, at the time of the trial in 1869, when the land may have increased or decreased ten fold in value? What more relevancy does such evidence have to the issue, than the evidence authorized by the statute now under consideration?

Again, the ordinance authorizes the parties to give in evidence the particular *currency* in which payment was to be made; and the *value* of such currency *at any time.* Suppose the contract was made on the 1st day of July, 1861, when the currency was worth ninety cents on the dollar, in gold. And suppose the note was made in reference to Confederate treasury notes, and was due 1st January, 1862, in that currency, which, at the date when due, was worth, in gold, eighty cents on the dollar. Now, I ask, how evidence, as to the value of Confederate treasury notes on the first day of May, 1865, when $1,200 00 of those notes were worth but $1 00 in gold, tends to illustrate the issue, as to the sense in which the parties used the word dollar? It cannot be denied that the evidence, in the case supposed, would be admissible, under the rulings of this Court, which have repeatedly sustained the constitutionality of the ordinance. But it would be admissible, not so much to show the sense in which the parties used the word "dollar," as to place all the facts and circumstances connected with the whole transaction before the jury, to enable them to "adjust the equities between the parties."

In *Hudspeth vs. Johnson,* 34 *Ga. R.,* 405, that great and good man, Chief Justice Lumpkin, says: "We know full well, that the letter of that ordinance only applies to *contracts,* made between June, 1861, and June, 1865, but we doubt not it will receive, as it ought to do, a much broader signification."

In *McLaughlin & Co. vs. O'Dowd,* 34 *Ga. R.,* 485, the same learned Judge says: "The jury had the right, not only to *reduce* the respective demands of the parties to a specie

basis, but also to go into an examination of the consideration for which the note was given, how much ought to be *deducted* from the *amount* of *said note*, by the unsoundness of the tobacco for which the note was given, what is the usage of trade in the community where the parties resided, as it respects settlements between merchants, etc., these, and all other matters which affected the equity of the parties, the jury had a right to inquire into, and to find their verdict accordingly."

He then refers to th estatute in Crawford and Marbury's Digest, passed at the close of the Continental war, by which all contracts were required to be reduced to the specie basis, and settled accordingly ; and adds : " I will not undertake to say that this legislation was not just at the time; but that it would be a proper standard now, it requires no degree of experience in business to satisfy any one to the contrary. Our Convention has acted more wisely under the circumstances, past and present, by which they were surrounded.

Walker, Judge, says, in *Cothran et al. vs. Scanlan*, 34 *Ga. R.*, 557 : " I am inclined to think that specie value of currency payable, is not the *sole* criterion prescribed by the ordinance of the Convention. The language would seem to allow and require a much *wider scope* for investigation."

In the case of *Slaughter et al. vs. Culpepper et al.*, 35 *Ga. R.*, 27, Judge Harris delivering the opinion of the Court, holds the ordinance constitutional. He says: " I cannot think this clause of the ordinance obnoxious to the objection. It does no more, really, than change a rule regulating the admission of testimony in courts of law; it removes the obstacles created by technical rules, to a full inquiry into, and investigation of, executory contracts, made within the periods of time mentioned. It is apprehended, that to have done this, was within the competency of the legislative power at any time. Who is prepared to deny that the Legislature may not, at its discretion, alter and amend old rules of evidence and establish new ? Who, that it may not obliterate all distinctions which now characterize

modes of procedure in courts of law and courts of equity and command, if they so enact, that the broad and liberal principles upon which justice is administered on the equity side of the Superior Courts, shall apply to and control the verdicts of juries on its law side?"

The validity of the ordinance was again sustained in *Evans vs. Walker*, 35 *Ga. R.*, 118. After laying down the rule that the Judge who tries each case should give the *whole* ordinance in charge to the jury, Chief Justice Lumpkin says: "We certainly think that the Convention intended to give to the jury *more than the ordinary discretion* delegated to jurors; which should be respected by the Courts, unless flagrantly abused to the manifest wrong and injury of the parties."

This Court again affirmed the constitutionality of the ordinance in *Taylor vs. Flint*, 35 *Ga. R.*, 124, and sustained and executed it in the following cases: *Elder vs. Ogletree*, 36 *Ga. R.*, 64; *Cherry vs. Walker*, 36 *Ga. R.*, 327; *Oliver et al. vs. Coleman et al.*, 36 *Ga. R.*, 553.

In this case, Judge Warner laid down the rule that the Court should allow the juries a *liberal discretion* under the ordinance.

No one can draw a solid distinction in principle between the Ordinance of 1865 and the Statute of 1868. If one is constitutional the other is also. Both change the old rule of evidence, and let in evidence heretofore considered by the Courts irrelevant and improper. The object is the same in both cases, to reduce the debt "*sued for*," in accordance with the real equities existing between the parties, and not to allow a recovery according to the face of the contract, unless the equities of the case justify it. And I apprehend neither of the four learned Judges above named, in sustaining the constitutionality of the ordinance, felt for a moment that he was "*embalming* himself in his own *infamy* upon the records of this Court as a *debauched* judicial officer."

I am aware that an attempt was made in this Court, at the hearing, to draw a distinction, growing out of the power

Cutts & Johnson *et al.*, *vs.* Hardee.

given by the statute to the jury, to *reduce* the debt. But a moment's examination will show that none in fact exists. The statute enacts that " in all such cases, the juries which try the same, shall have power to reduce the amount of the debt or debts *sued for*, according to the *equities* of each case, and render such verdicts as to them shall appear just and equitable."

Now, what is the meaning of this? That the jury shall hear all the evidence necessary to place them in possession of all the facts and circumstances connected with the contracts, and the relations and condition of the parties, and shall find their verdict according to the *real equities* existing between them; or, in other words, after examining the whole case, in the light of all the surrounding circumstances, they are to render such verdict as to them shall seem just and equitable, subject, as in all other cases, to the revision and control of the Court, if it should think proper to set it aside and grant a new trial, because the verdict is unjust or inequitable. This is the full measure of the power and discretion given to the jury by the statute. And this is what the juries have long had the power to do, under such rules of evidence as existed at the time, and have done, in a thousand cases where the defence of fraud, accident, mistake, undue influence, duress, total or partial failure of consideration, have been set up. In all such cases they find such verdict, under the evidence submitted to them, as seems to them just and equitable. The oath administered to every special jury in Georgia, from 1799 to 1863, required this. They were sworn well and truly to try each cause submitted to them, and a true verdict give, (not according to the rules of law in force when the contract was made, but,) "according to *equity* and the *opinion* you entertain of the *evidence* produced to you, to the best of your skill and knowledge, without favor or affection to either party." Marbury and Crawford's Digest, 307. Cobb's New Digest, 551. And this is just what the Ordinance of 1865 authorizes and requires, no more, no less. After prescribing the rules of evidence to govern in case of contracts made between June, 1861, and June, 1865, the ordinance declares

that the verdict and judgment rendered shall be on princi-
ples of *equity*. And the caption, or title, declares it to be
an ordinance " to authorize the courts of this State to *adjust
the equities* between parties to contracts made, but not execu-
ted." What does this mean? Simply that the jury, after
hearing all the evidence authorized by the ordinance, shall
adjust the *equities* between the parties. In other words, they
shall find " such verdict as to them shall appear *just* and
*equitable*." And this rule applies with equal force to all ver-
dicts, whether rendered under the ordinance or under this
statute.

I need only add, in considering this branch of the case,
that no honest man has any good reason to complain, when
the verdict rendered in his case gives him all, to which in
justice, equity and good conscience he is entitled.

6. But if the jury should seize upon the discretion given
by the statute, as a pretext for the exercise of an unjust and
arbitrary caprice, and should fail to administer substantial
justice, and to dispense that equity between the parties which
grows out of all the facts and surrounding circumstances of
each case, it will be the duty of the Courts to exercise their
undoubted power, and set aside such unjust verdicts, whether
rendered in favor of plaintiffs or defendants.

7. In this case no complaint can be made at the finding
of the jury, as there was no verdict. The defendants filed
pleas which were intended to lay the foundation for the intro-
duction of the evidence authorized by the statute, and the
Court sustained plaintiff's demurrer to the pleas, and ordered
them stricken from the record. A majority of this Court
are of opinion that this ruling of the Court below was erro-
neous. We are unable to see how the obligation of the con-
tract was in any degree impaired by the filing of these pleas.

8. When a statute authorizes certain facts to be given in
evidence to the jury, which, under the old law, were excluded,
and the defendant so shapes his pleas as to lay the proper
foundation for the introduction of the evidence authorized by
the statute, such pleas are not bad on demurrer, because not
authorized by the old rules of pleading. If a statute gives

Cutts & Johnson *et al.*, *vs.* Hardee.

a new defence, or authorizes the introduction of evidence not previously admissible, the defendant may so shape his pleas as to avail himself of the benefits of the new law, and the old rules of pleading must yield to the statute.

Without making any *pharisaical* pretensions to greater purity than others possess, the majority of the Court, conscious of the rectitude of their own motives, feel it due to themselves, in closing this opinion, to remark, that they will not descend from their proper position on the bench, to engage in controversy with the dissenting Judge; nor will they inquire into the *incentives* which have prompted the unjust and insidious assault made upon them. Extraordinary and unprecedented as the attack has been, the proprieties of the occasion, and the dignity of the Court, alike forbid a reply.

After a careful examination of the authorities, we are satisfied that the judgment of the Court below is erroneous, and ought to be reversed. And it is so ordered.

McCay, J., concurring, announced his views by the head notes, which appear under his name, but he wrote no opinion in the cause.

Warner, J., dissenting.

This was an action brought by the plaintiff against the defendants, on a promissory note, for the sum of $5,200 00, dated 22d January, 1861, and due forty-five days after date. The defendant, Stewart, filed a plea to the plaintiff's action against him, in which he alleged certain facts by way of *defence* thereto, as provided by the provisions of the first section of the Act of 1868, for "the relief of debtors, and to authorize the adjustment of debts upon the principles of equity." The plaintiff demurred to the defendant's plea, and the Court below sustained the demurrer. The defendant excepted, and now assigns for error here, that the Court erred in sustaining the plaintiff's demurrer to his plea. The legal merits of the plea will be better understood, by reciting the first section of the Act which authorizes the facts contained in the plea, to be set up as a *legal defence* to the plain-

tiff's action upon the note. The first section of the Act of 1868, declares, "That, in all suits, which shall be brought for the *recovery of debts* in any of the courts of this State, or upon *contracts* for the payment of money, made *prior* to the 1st of June, 1865, (except for the sale or hire of slaves), it shall be *lawful* for the parties in all such cases, to give in evidence before the jury impanneled to try the same, the consideration of the debt, or contract, which may be the subject of the suit, the amount and value of the property owned by the defendant at the time the debt was contracted, or the contract entered into, to shew upon the faith of *what property* credit was given to him, and what tender, or tenders of payment he made to the creditor, at any time, and that the non-payment of the debt, or debts, was owing to the refusal of the creditor to receive the money tendered, or *offered to be tendered*, the destruction or loss of the property upon the faith of which the credit was given, and *how*, and in what *manner*, the property was lost or destroyed; and by *whose default;* and in all such cases, *the juries which try the same, shall have power to reduce the amount of the debt or debts sued for, according to the equities of each case*, and render such verdicts as *to them shall appear just and equitable.*" The plea, and the demurrer thereto, necessarily raises the question, whether the *facts* authorized by this Act of the Legislature, can be plead as a *legal defence*, and proved, so as to authorize the jury to *reduce* the amount of the plaintiff's debt, as to *them* shall appear just and equitable. If the Legislature have the *constitutional power* to enact a law to that effect, then, it can be done, but if the Legislature have not the constitutional power and authority to do so, then it cannot be done, and that is the *precise question* presented for the decision of the Court by the plea and demurrer. The plea sets forth the *facts* which the Act authorizes the defendant to plead, and prove, as a *legal defence*, in order to *reduce the plaintiff's debt*. The plaintiff demurs thereto, and says, admitting all the facts stated in your plea to be true and authorized by the Act, still, under the supreme law of the land, the Legislature had no power to pass such an Act,

because it *impairs* the obligation of the plaintiff's contract, and he demands the judgment of the Court upon *that issue of law* which is made by his demurrer. The constitutionality of the Act is, therefore, *necessarily* presented by the plea and demurrer for the judgment of the Court. There is no *dodging* it. The question is *squarely* presented by the plea and demurrer. Is the Act constitutional or not? If it is, then the plea is good. If the Act is not constitutional, then the plea is bad, and constitutes no *legal defence* to the plaintiff's action; that is all there is in it, and this Court ought not to *shirk* its responsibility by referring it to a jury, to see whether they would make any *improper use* of the evidence authorized by the Act. I shall not undertake here to repeat what was said in the case of *Aycock et al., vs. Martin et al.,* 37 *Ga. R.,* 127, in regard to what constitutes the *obligation* of a contract, but will state the rule upon that question, as declared by the Supreme Court of the United States, in two of the *latest* decisions made by that Court, upon a careful review of *all the prior adjudications* made by that tribunal. The Supreme Court of the United States is the recognized interpreter and expounder of the Federal Constitution, and its decision upon the question now under consideration, is *binding authority* upon this Court. In the case of McCracken vs. Hayward, 2 Howard's Reps, 612, the Court says: "The *obligation* of a contract consists in its *binding force* on the party who makes it. This depends on *the laws in existence when it is made*; these are necessarily referred to in all contracts, and forming a part of them, as the *measure of the obligation* to perform them by the one party, and the right acquired by the other. There can be no *other standard* by which to ascertain the extent of either, than that which the terms of the contract indicate, according to their settled *legal* meaning. When it becomes consummated, the *law* defines the *duty*, and the *right, compels* one party to perform the thing contracted for, and gives the other a right to *enforce* the performance by *the remedies then in force.* If any subsequent law affect to *diminish* the duty, or to *impair the right,* it necessarily bears on the obligation of the contract in favor

of one party to the injury of the other; hence *any law*, which in its operation amounts to a denial, or *obstruction* of the rights accruing by a contract, though *professing* to act only on *the remedy*, is directly obnoxious to the prohibition of the Constitution." Again the Court says: ".The *obligation* of the contract between the parties in this case, was to *perform* the promises and undertakings contained therein; the right of *the plaintiff* was to damages for the breach thereof, to bring suit and obtain a judgment, to take out and prosecute an execution against the defendant till the judgment was satisfied, pursuant to the *existing laws of Illinois.* These *laws*, giving these rights, were as perfectly *binding on the defendant*, and as much a *part of the contract*, as if they had been set forth in its stipulations in the *very words of the law* relating to judgments and executions." In the case of Van Hoffman vs. The City of Quincy, (4 Wallace Rep., 550), decided in 1866, the Court, after receiving and commenting upon the previous adjudications made upon this question in the Supreme Court of the United States, says: "It is also settled, that *the laws which subsist at the time* and place of the making of a contract, and where it is to be performed, enter into, and form a *part of it*, as if they were expressly referred to, or incorporated in its terms. This principle embraces alike those which affect its validity, construction, discharge, and *enforcement*." On page 554 the Court, speaking of the distinction between the obligation of the contract and the remedy, says: "The doctrine upon that subject, by the *latest* adjudications of this Court, render the distinction' one rather of *form* than *substance.* A *right* without a *remedy* is as if it were *not.* For every beneficial purpose, it may be said *not to exist.* A different result would leave nothing of the contract but an *abstract right* of no *practical value*, and render the protection of the Constitution a *shadow* and a *delusion.* Nothing can be more material to the obligation of a contract than *the means of enforcement.* Without the *remedy*, the contract may, indeed, in the sense of *the law*, be said *not to exist*, and its obligation to fall. within the class of those social duties which depend, for their

Cutts & Johnson *et al.*, *vs.* Hardee.

fulfilment, wholly upon the will of the individual. The ideas of validity and remedy are *inseparable*, and *both* are parts of *the obligation* which is guaranteed by the Constitution against *invasion."*

Again, the Court, say in that case, " one of the *tests* that a contract has been *impaired* is, that its *valve* has, by legislation, been *diminished.* It is not, by the Constitution, to be *impaired at all.* This is not a question of degree, or cause, but of *encroaching,* in *any respect, on its obligation,* dispensing with *any part of its force."* In Green vs. Biddle, (8 Wheaton's R., 1), the Supreme Court of the United States, thus state the rule in regard to laws *impairing* the obligation of contracts : " The objection to a law on the ground of its impairing the obligation of a contract, can never depend upon the *extent* of the change which the law effects in it. Any deviation from its terms, by *postponing,* or *accelerating* the period of performance which it prescribes, imposing *conditions* not expressed in the contract, or *dispensing* with the performance of those which are, however minute, or apparently immaterial in their effect upon the contract of the parties, *impairs* its obligation."   The soundness of this principle of the law, as applicable to contracts, has been twice distinctly recognized by this Court.   See *The Justices of the Inferior Court of Morgan county vs. Sparks et al.,* 6 *Ga. R.,* 439 ; *Winter vs. Jones,* 10 *Ga. R.,* 195.   The *modern doctrine* asserted by the majority of this Court, " that the Legislature has the right to change, modify, or vary the nature and extent of *the remedy,* provided a *substantive remedy* is left to the creditor," finds no countenance or support, in the decisions of the Supreme Court of the United States, whenever such change, modification, or variance *impairs* the obligation of the contract, or hinders, or obstructs its *enforcement.*   The Constitution of the United States declares, that " No State shall pass *any law impairing the obligation of contracts."*   We have shewn, by the decisions of the Supreme Court of the United States, (which are binding authority upon this Court, in regard to the question involved), what is the well established rule in regard to *impairing* the obliga-

tion of contracts, as well as what constitutes *the obligation* of a contract. Now, let us examine and see whether the Act of 1868, according to the *latest* adjudications of that Court, *impairs* the obligation of the plaintiff's contract in this case. When the contract was made, in 1661, the law, as it *then* existed, did not allow the defendant to prove, upon the trial of a suit for the enforcement of his contract, by way of *defence*, that he had tendered, or offered to tender, him Confederate money, in payment of his debt, did not allow him to prove, upon the trial, the destruction or loss of his property by emancipation, or other cause, or to prove, upon the faith of what property the credit was given to him, or to prove the amount and value of the property owned by him at the time the debt was contracted, or that he had lost his property by the *default* of any person, and especially did not the *existing law* at the time the contract was made, allow the defendant, upon proof of these facts, or any of them, to have the plaintiff's debt *reduced* in amount, to such a sum as the jury, who might try the case, should think to be just and equitable; but, by the Act of 1868, the defendant can prove any or all of these facts, as a *legal defence*, and thereupon, the Act declares that the jury which try the case, shall have *power to reduce the amount of his debt*, according to the equity of his case, as made by the aforesaid evidence, and render such verdict as *to them*, shall appear just and equitable, under the aforesaid evidence. In other words, the Act makes certain facts a *legal defence* to the plaintiff's suit, which were *not a legal defence* when the contract was made, authorizes the defendant to prove them on the trial, and thereby, *reduce* the amount of his debt, as the jury, upon consideration of *such facts*, shall deem to be equitable and just. In short, by this manipulating process, to make a new and different contract for him, from the one made by the contracting parties, under the existing law, at the time the contract was made, creating a new and different obligation on the part of the defendant to perform it, to the *prejudice* of the plaintiff's rights, as the same existed under the law, at the time of making the contract. One thing is very cer-

tain, that the rights of the parties, under the contract and the obligation to perform it, are not the same *now*, under the provisions of the Act of 1868, as they were under the law which existed, applicable to the contract *at the time it was made.*

In the case of Van Hoffman vs. The City of Quincy, before cited, the Supreme Court says, that "one of the *tests* that a contract has been impaired, is, that its value has, by legislation, been *diminished.*" Apply that test to the plaintiff's contract in this case. Would any rational man give as much for this contract, and the defendant's obligation to perform it, *now*, since the passage of the Act of 1868, authorizing the defendant to prove in his defence the facts specified therein, with *power* given to the jury to *reduce* the amount of the debt, on proof of such facts, as he would have given for it under the law as it existed at the time the contract was made? If not, why not? The answer is obvious to any rational mind. It is because the Act of 1868 renders that contract, and the obligation to perform it, *less valuable* on account of the *defences* allowed by that Act, and *the power* given to the jury by it to *reduce the debt* as to *them* may seem just and equitable. The law that existed and controlled the rights of the parties at the time the contract was made, has been changed, whereby the plaintiff's rights have been *injured*, and the defendant's obligations to perform that contract imposed on him by the existing law at the time the contract was made, has been *impaired* by that Act to the plaintiff's *prejudice.*

But it is said this Act only changes the *remedy*, only changes the *rules of evidence*, and that it is competent for the Legislature to do that without impairing the obligation of the contract. It is true, the Legislature have the constitutional power to alter and change the remedy, to alter and change the rules of evidence: *provided always*, that in doing so, the obligation of the contract is not *impaired*, within the true intent and meaning of the Constitution. It is *not true*, however, that the Legislature have the power, either under the pretext to alter and change *the remedy*, or under the pre-

text to alter and change *the rules of evidence,* to *impair* the obligation of contracts.   It makes no difference under what *name* or *pretext* the injury is done, the question to be answered in this case is, whether the Act of 1868 *impairs* the obligation of the plaintiff's contract as the same existed under the law *at the time the contract was made?*   According to the principles recognized and adjudicated by the Supreme Court of the United States in the cases before cited, this Act of the Legislature most clearly and unquestionably *impairs* the obligation of the plaintiff's contract, and is, therefore, unconstitutional and void.

It has been said in this case, however, that if the jury should *reduce* the plaintiff's debt, other than *the equities* between the parties permit, it will be the duty of the Court to set the verdict aside.   What equities?   Such equities, I suppose, as spring out of the *facts* authorized to be proved by the defendant in his *defence to the note,* under the Act of 1868, which did not constitute any *legal* defence thereto at the time the contract was made.   But if the Act is *constitutional,* then the evidence authorized to be submitted to the jury under it is *legal* evidence, and the jury have the right to consider it, and act upon it, and are expressly clothed with *power,* by the Act, to *reduce* the amount of the plaintiff's debt as to *them* shall appear just and equitable.   If the jury shall do what the Act *expressly empowers them to do,* it is extremely difficult to perceive what legal right the Court would have to set aside their verdict.   Under the Act, the jury have the *power,* under the evidence authorized by it, to render such verdict as to *them* shall appear just and equitable.   If the Act is constitutional, and the evidence before the jury is *legal* evidence, and the jury return a verdict upon it *reducing* the amount of the plaintiff's debt, what *legal* right or power has the Court, under this Act, to set their verdict aside?   The verdict would not be contrary to *law,* if the Act is constitutional, nor contrary to the *evidence;* the *power* to reduce the debt is expressly conferred upon the jury by the Act, and therefore the Court would have *legal* right to interfere with their verdict.   But take the other view of the question, and hold

that the Courts have the *legal right* to set aside the verdict, if the jury shall impair the obligation of the plaintiff's contract by *reducing his debt,* then it is quite apparent that the Act of 1868, for the relief of debtors, *practically* amounts to nothing, it is mere *brutum fulmen.* The plain truth, however, is, that the Legislature intended to provide for the relief of debtors in the manner indicated by the Act, and did not intend that the Courts should set aside the verdicts of the juries, if they *reduced* the plaintiff's debt, and thereby render the Act a *practical nullity.*

It was contended, on the argument, that the Act of 1868 stood upon the same footing as the ordinance of the Convention of 1865, and that this Court had held that ordinance to be constitutional. That ordinance simply provided, that in any suit for the *enforcement of any contract* specified therein, the parties might show the particular *currency* in which payment was to be made, and the *value* of such currency, etc. The object of that ordinance was, not to *impair* the obligation of contracts, but to *enforce* them according to the actual value thereof in *good money.* If the contract was payable in Confederate dollars, it allowed evidence to be given as to the *value* of Confederate dollars in *good money,* and what was the value of the consideration of the contract in *good money,* so as to maintain and *enforce* the obligation of the contract upon the principles of equity, as *regulated by law.* See *Oliver & Wooten vs. Coleman et al., 36th Ga. Rep.,* 555. The rights of the people in this State to their property and effects are regulated and protected by *law,* and are not *dependent* upon the abstract notions of *equity* which a Court or jury may entertain of them. It is *the law of the land* which regulates and controls the rights to property in this State. There is *no equity* which is above or independent of *the law.* The Code declares that "equity is *ancillary,* not *antagonistic,* to the law: hence, equity *follows the law,* where the rule of law is applicable, and the *analogy of the law,* where no rule is directly applicable." Code, section 3028. I am aware that *sporadic* decisions, made by the State Courts, can be cited in favor of impairing the obligation of contracts,

though *professing* not to do so, under the *pretext* of regulating the *remedy* and the *admissibility of evidence*, but these decisions have generally been made under the pressure of public opinion, in times of pecuniary embarrassment, when the relief *spasm* was upon the people; sometimes made by Judges who were *expressly appointed* for the purpose of making such decisions during *that period of time;* but such decisions, so made, are entitled to very little consideration in the face of the plain provisions of the Constitution, and the plain interpretation thereof by the repeated decisions of the Supreme Court of the United States, which have already been cited, and which are *binding authority* upon this question. The great weight of judicial authority in the several States is, however, in favor of maintaining the integrity of the Constitution, and protecting the *inviolability* of the obligation of contracts. That there should have been any conflict of decisions in the State Courts upon this question, only proves, that when there is a *will* to impair the obligation of contracts, subtle, crafty, unscrupulous men can always find a *way* to do it. Robbery, under the form and color of *law*, is the *meanest* sort of robbery. The highwayman who presents his pistol to the head of the traveler, and commands him to stand and deliver, incurs some *personal risk*, but those who rob under the form and color of *law*, accomplish the same object as the highwayman, without the least *personal danger* to themselves. The common and usual *pretext* for violating the Constitution, is under the *form of remedial legislation*, or by altering the *rules of evidence*. These *pretexts* and *excuses*, though often specious and plausible, will not bear the test of *legal criticism*. But the Supreme Court say, in the case of Van Hoffman vs. The City of Quincey, before cited, that the distinction between the *contract* and the *remedy*, by the *latest* adjudications of that Court, is one rather of "*form* than substance." This is sound doctrine. What is a man's *right* to his contract worth, at the time of making it, without the *remedy* afforded by the *then existing law to enforce it?* If the Act of 1868 is *constitutional*, it illustrates very clearly what the plaintiff's right to *his* contract in this case is worth *now*.

The First National Bank of Macon *vs.* Nelson & Co.

The Constitution of the United States is the fundamental and *paramount law* for the government of the Courts and people of this State.   It has been justly remarked, by an eminent civilian, that "to attack the Constitution of the State, and to violate its laws, is a *capital crime against society*, and if those guilty of it are *invested with authority*, they add to this crime a *perfidious abuse of the power with which they are intrusted.*   Vattel, 9, section 30.   In view of the obligation imposed upon *me* to support and maintain the integrity of the Constitution of the United States, which declares that "no State shall pass *any law* impairing the obligation of contracts," and not entertaining the least doubt that the Act of 1868, both upon principle and the authority of the decisions of the Supreme Court of the United States, is a *palpable* violation of that Constitution, I am unwilling to *embalm* myself in my own *infamy*, upon the records of this Court, as a *debauched* judicial officer, in holding that Act to be *constitutional;* therefore, I dissent from the judgment of the Court in this case.